## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
### No. 1:18-cv-502

| | | |
|---|---|---|
| LLOYD BUFFKIN,<br>KIM CALDWELL, and<br>ROBERT PARHAM, individually<br>and on behalf of a class of similarly<br>situated persons,<br><br>      **Plaintiffs,**<br><br>      **v.**<br><br>ERIK HOOKS, individually and in<br>his official capacity as Secretary of<br>the North Carolina Department of<br>Public Safety,<br><br>ABHAY AGARWAL, individually<br>and in his official capacity as Acting<br>Medical Director, Department of<br>Adult Correction, North Carolina<br>Department of Public Safety,<br><br>KENNETH LASSITER,<br>individually and in his official<br>capacity as Director of Prisons,<br>Department of Adult Correction,<br>North Carolina Department of<br>Public Safety,<br><br>PAULA SMITH, former Medical<br>Director, Department of Adult<br>Correction, North Carolina<br>Department of Public Safety,<br>individually, and<br><br>The NORTH CAROLINA<br>DEPARTMENT OF PUBLIC<br>SAFETY,<br><br>      **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br> | **CLASS ACTION COMPLAINT** |

1.     Plaintiffs are incarcerated by the North Carolina Department of Public Safety (DPS). All have been diagnosed with hepatitis C infection (HCV), a highly communicable disease that scars the liver and presents risks of cancer, portal hypertension, excruciating pain, and death.

2.     Plaintiffs have requested treatment that complies with the current standard of medical care: direct-acting antiviral drugs (DAAs) that cure the vast majority of patients infected with HCV.

3.     Defendant prison officials have refused to treat Plaintiffs. Unless a patient also has hepatitis B or HIV, DPS only permits DAA treatment when a patient has already suffered significant liver scarring and the risks of further significant injury are higher.

4.     There is no medical reason justifying the denial of DAAs to Plaintiffs. Rather, DPS refuses to provide medically necessary treatment simply to avoid the associated costs.

5.     Even patients in DPS custody with the most advanced forms of HCV—and at the greatest risk of experiencing the disease's most horrific outcomes—may not qualify for treatment. Regardless of how advanced a patient's disease is, DPS policy forbids DAA treatment if the patient has less than twelve months left on his sentence, a life expectancy of less than ten years, or a drug or alcohol infraction committed within the previous twelve months. None of these restrictions are medically justified. They exist only to spare DPS further cost.

6.     DPS has also failed to implement medically adequate HCV screening practices. Despite the high concentration of HCV in prisons, DPS has not implemented universal

screening. Instead, DPS employs an outdated, risk-based approach that does not actually require testing of anyone. Thus, there are almost certainly thousands of people in DPS custody with undiagnosed HCV. And, once a prisoner receives an HCV diagnosis, she may go years without follow-up testing.

7.      By maintaining these policies and practices, Defendants have shown deliberate indifference to Plaintiffs' serious medical needs in violation of the Eighth Amendment's prohibition of cruel and unusual punishments. Defendants have also violated Plaintiffs' rights under the Americans with Disabilities Act by denying them medical services on the basis of their disability.

8.      Plaintiffs seek declaratory and injunctive relief on behalf of themselves and a class of all current and future persons in the custody of the North Carolina Department of Public Safety who have or will have chronic HCV, have at least 12 weeks remaining on their sentences, and have not received DAA treatment. Named Plaintiffs also seek damages for the harm suffered by the denial of medically necessary treatment.

9.      Plaintiffs have either exhausted their administrative remedies or the DPS Administrative Remedy Procedure has been unavailable to them.

**JURISDICTION AND VENUE**

10.     Plaintiffs bring this action under 42 U.S.C. § 1983, the Eighth and Fourteenth Amendments to the United States Constitution, and the American with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq*.

11.     Jurisdiction is proper under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

12.     Venue is proper under 28 U.S.C. § 1391(b)(2), as substantial events at issue in this litigation occurred in the Middle District of North Carolina.

## PARTIES

13.     Plaintiff Lloyd Buffkin is an adult man currently incarcerated at Scotland Correctional Institution in Laurinburg, North Carolina. He has been diagnosed with chronic HCV and has not been treated for it.

14.     Plaintiff Robert Parham is an adult man currently incarcerated at Polk Correctional Institution in Butner, North Carolina. He has been diagnosed with chronic HCV and has not been treated for it.

15.     Plaintiff Kim Caldwell is an adult man currently incarcerated at the Dan River Prison Work Farm in Blanch, North Carolina. He has been diagnosed with HCV and has not been treated for it.

16.     Defendant North Carolina Department of Public Safety is a public entity as defined by Title II of the Americans with Disabilities Act. It is sued for declaratory and injunctive relief and money damages on Plaintiffs' ADA claims only.

17.     Defendant Erik Hooks is the Secretary of DPS. He is responsible for the overall operation of DPS, including North Carolina's prisons. Defendant Hooks has a legal duty to provide adequate medical care to all persons in DPS custody. He is sued in his official capacity for injunctive and declaratory relief, and in his personal capacity for money damages.

18.     Defendant Paula Smith is the former Medical Director for the Division of Adult Correction (DAC) of DPS. She was responsible for the creation and implementation of

4

DPS medical policy governing treatment of patients incarcerated in DAC. Defendant Smith had a legal duty to provide adequate medical care to all persons in DAC custody. She is sued in her personal capacity for money damages.

19.     Defendant Abhay Agarwal is the acting Medical Director for DAC. He is responsible for the creation and implementation of DPS medical policy governing treatment of patients incarcerated in DAC. Defendant Agarwal has a legal duty to provide adequate medical care to all persons in DAC custody. He is sued in his official capacity for injunctive and declaratory relief, and in his personal capacity for money damages.

20.     Defendant Kenneth Lassiter is the Director of Prisons for DAC. He is responsible for the overall operation of North Carolina's prisons, including the creation and implementation of DPS policy. Defendant Lassiter has a legal duty to provide adequate medical care to all persons in DAC custody. He is sued in his official capacity for injunctive and declaratory relief, and in his personal capacity for money damages.

21.     Defendants may be referred to collectively as DPS.

## DR. ANDREW MUIR

22.     Plaintiffs' counsel has retained Dr. Andrew Muir, a board-certified gastroenterologist and Chief of the Division of Gastroenterology at Duke Hospital, to consult on Defendants' policies and practices regarding HCV. He has signed an affidavit that discusses background information on HCV, the medical standard of care for screening and treatment of HCV, facts specific to people living with HCV in DPS custody, and DPS's policies on screening and treatment of HCV. His affidavit is attached to the complaint as Exhibit A and informs the following allegations.

5

# FACTS

## Background Information on Hepatitis C

23.     HCV is a viral infection that causes liver inflammation. The disease spreads by exposure to blood or blood products. Transmission commonly occurs through tattooing, sex, organ transplants, blood transfusion, and intravenous drug use.

24.     HCV infection can be acute or chronic. Patients with acute HCV are usually asymptomatic or have mild symptoms such as fatigue. An acute infection may spontaneously clear itself from a patient's blood within six months of exposure. When HCV is still detectable in a patient's blood six months after exposure, the condition is defined as chronic. Approximately 80 percent of infected patients will develop chronic HCV.

25.     Untreated, the inflammation caused by HCV will result in scarring of the liver, called fibrosis. Fibrosis significantly impairs the liver's critical functions of digesting nutrients, filtering toxins, and fighting infections.

26.     Extensive fibrosis is called cirrhosis. Advanced fibrosis or cirrhosis puts patients at risk of liver cancer and hepatic decompensation. Research has shown that the median time for progression to cirrhosis from infection is 30 years, but ranges from 13 to 42 years. Approximately one third of patients with chronic HCV have an expected median time to cirrhosis of less than 20 years.

27.     The development of fibrosis and cirrhosis is clinically silent in the majority of patients. Symptomatic patients often experience swelling, fluid retention, various skin problems, joint and muscle pain, and fatigue.

6

28.    Cirrhosis may progress from a silent condition to hepatic decompensation, which involves the development of painful complications from portal hypertension. These include ascites (fluid buildup in the abdomen), pedal edema (leg and feet swelling), variceal bleeding (bleeding from abnormal blood vessels, usually in the esophagus but possibly anywhere in the gastrointestinal tract), hepatorenal syndrome (kidney failure), and hepatic encephalopathy (confusion due to the accumulation of toxic substances in the blood).

29.    All patients with cirrhosis are at risk of portal hypertension and liver cancer (hepatocellular carcinoma, or "HCC"), both of which carry high mortality rates.

30.    Treatment of these conditions often requires invasive and painful procedures. Patients who develop these conditions are at high risk of death and should be evaluated for a liver transplant.

31.    As the DPS policy governing HCV treatment acknowledges, it is difficult to predict the rate at which the disease will progress.

32.    The METAVIR scale measures a patient's level of fibrosis. It grades the degree of fibrosis on a 5-point scale from 0 to 4. A liver biopsy can measure a patient's level of fibrosis, but because biopsies are painful and carry risks of hemorrhage and even death, other less invasive tests have been developed and are more commonly used.

33.    DPS uses a FibroSure test to determine a patient's level of fibrosis. A score of F0 means no fibrosis, F1 is mild fibrosis, F2 is moderate or significant fibrosis, F3 is severe fibrosis, and F4 is cirrhosis.

34.     Research has shown, however, that the FibroSure's utility in assessing fibrosis is quite limited. FibroSure is best suited to determining whether a patient has cirrhosis or not. The test's accuracy in determining a patient's specific stage of fibrosis, on the other hand, is poor. The test's sensitivity for detecting significant fibrosis has been reported at only 60-75 percent.

35.     Therefore, a patient with a FibroSure result showing mild or moderate fibrosis has an alarmingly high chance of actually having far more advanced fibrosis and more urgently requiring treatment.

## HCV Screening

36.     HCV is typically diagnosed through a blood test that reveals HCV antibodies. Guidelines from the American Association for the Study of Liver Diseases (AASLD) and Infectious Diseases Society of America (IDSA)—which constitute the current standard of care for HCV screening—recommend screening certain populations based on demography, prior exposures, behaviors, and medical conditions. This screening increases the likelihood of early detection and reduces the risk of liver cancer, death, and transmission to others.

37.     The AASLD/IDSA guidelines recommend screening of all persons who have ever been incarcerated. The Centers for Disease Control and Prevention (CDC) recommend screening of all persons born between 1945 and 1965, and all who have ever injected drugs.

8

## Medical Standard of Care for HCV

38.    Before 2013, HCV treatment involved injectable interferon-alpha medications that caused severe side effects including flulike symptoms, psychiatric and autoimmune disorders, and gastrointestinal problems. The treatment regimen lasted between six and twelve months, and ultimately worked in only about half of the patients who could tolerate the medicine.

39.    The standard of care for chronic HCV changed after direct-acting antiviral drugs became available in 2013. DAAs are taken orally, involve a regimen of only eight to twelve weeks, cause minimal side effects, and cure HCV in 90-95 percent of patients.

40.    These drugs include Sovaldi (sofosbuvir), Olysio (simeprevir), Harvoni (sofosbuvir/ledipasvir), ViekiraPak (ombitasvir/paritaprevir/ritonavir/dasabuvir), Daklinza (daclatasvir), Technivie (ombitasvir/paritaprevir/ritonavir), Zepatier (elbasvir/gr azprevir), Epclusa (sofosbuvir/velpatasvir), and Mavyret (glecaprevir and pibrentasvir).

41.    The AASLD and IDSA provide guidelines setting out the current standard of care for HCV treatment.

42.    These guidelines state that *all* patients with chronic HCV should receive treatment with DAAs. The only exception is for patients "with short life expectancies that cannot be remediated by treating HCV, by transplantation, or by other directed therapy."

43.    In ongoing litigation in the Eastern District of North Carolina, Defendant Smith has agreed that DAA treatment for chronic HCV, except for patients with short life expectancies, is the current standard of medical care.

44.     Beyond a patient having an allergy to DAAs or some other life-threatening condition, few other medical reasons exist for not treating chronic HCV with DAAs.

45.     It is not medically acceptable to recommend treatment based on a patient's level of fibrosis.

46.     Successful HCV treatment depends in part on how far the disease has progressed. Patients treated earlier will respond better to treatment and have a greater likelihood of being cured.

## HCV as a Public Health Issue

47.     Hepatitis C presents immense public health concerns. The disease causes more deaths in the United States every year than 60 other infectious diseases combined, including HIV, pneumococcal disease, and tuberculosis.

48.     There is a higher concentration of persons with HCV in prison and jail than in the general population. The National Institute of Health (NIH) has estimated that 17.4 percent of all incarcerated persons have HCV. The CDC place the figure at 33 percent. Defendant Smith recently stated that DPS has identified 1,543 inmates as having chronic HCV, but, based on the CDC and NIH figures, she estimated that the total number of infected inmates was between 6,559 and 12,553.

49.     Defendant Smith reported in April 2018 that only 589 DPS inmates had completed DAA treatment, and another 72 were receiving or had been approved for DAA treatment.

50.     This heavy concentration of HCV in North Carolina's prison population presents a serious public health problem. Prisoners are at increased risk of infection, and the vast majority of them will be released. This places the general population at greater risk,

especially if a released prisoner doesn't know that he has HCV—an event that seems all too likely given DPS's outdated, scattershot approach to screening.

51.    The concentration of HCV in prisons, however, also presents a unique opportunity. Because such a disproportionately large number of HCV-infected persons live in a highly controlled environment, it is less challenging to diagnose them, treat them, and in doing so, eradicate a significant portion of HCV in North Carolina. While DAA treatment is often expensive, North Carolina will likely pay for a prisoner's treatment even after he is released. North Carolina's Medicaid program covers the cost of DAA treatment for qualifying individuals regardless of the patient's fibrosis level.

## ALLEGATIONS BY NAMED PLAINTIFFS

### Lloyd Buffkin

52.    Lloyd Buffkin has been incarcerated in DPS custody since July 2013. He has a projected release date of December 13, 2030.

53.    Buffkin was diagnosed with hepatitis C in August 2017 while in DPS custody.

54.    As of July 2017, Buffkin had a FibroSure score of F1-F2.

55.    Therefore, he has at least suffered moderate to significant liver scarring. Because of the FibroSure test's inaccuracy, however, he may have in fact suffered more advanced fibrosis.

56.    Buffkin has also experienced chronic conditions associated with HCV, including fatigue and atopic dermatitis. These conditions cause him significant pain and suffering on a near daily basis.

57. Buffkin's chronic HCV also causes him great stress and worry. It is extremely difficult for him to know that the disease is gradually scarring his liver, but he cannot receive the cure until the disease progresses to where he is at even greater risk of severe injury and suffering.

58. Buffkin will not be considered again for DAA treatment until October of this year, following completion of another FibroSure test.

59. During this time, Buffkin's HCV may progress, further scarring his liver, impairing liver function, and putting him at increasing risk of cirrhosis, liver disease, excruciating pain, and death.

60. No medical reason exists to deny Buffkin treatment with DAAs.

61. Defendants' refusal to treat Buffkin with DAAs constitutes deliberate indifference to his serious medical need.

## Robert Parham

62. Robert Parham has been incarcerated in DPS custody since October 2008. He has a life sentence.

63. Parham has lived with chronic HCV for over 20 years.

64. Prior to DAAs becoming the standard of care for chronic HCV, DPS medical staff considered treatment with the old regimen of interferon, but concluded that Parham was not a suitable candidate.

65. Lab records from February 2015 show that his disease had advanced to F2. Lab records from January 2018 show a score of F1-F2. Thus, Parham has already suffered moderate to significant fibrosis. Because of the FibroSure test's inaccuracy, however, he

12

may have in fact suffered more advanced fibrosis. Indeed, his medical records that he has a history of cirrhosis. Parham has experienced symptoms consistent with advanced fibrosis and cirrhosis including pedal edema, fluid retention, dermatitis, pruritis, and joint pain. These conditions cause Parham significant pain and suffering on a near daily basis.

66.    In March 2018, DPS medical providers performed an ultrasound of Parham to assess his liver. Yet, DPS policy states that periodic liver ultrasounds should not be performed unless cirrhosis is already present or there is another definitive indication.

67.    Medical providers concluded, after review of Parham's ultrasound, that cirrhosis was not present. However, ultrasound is not appropriately utilized to diagnose cirrhosis.

68.    Parham's chronic HCV also causes him great stress and worry. It is extremely difficult for him to know that the disease is gradually scarring his liver, but he cannot receive the cure until the disease progresses to where he is at greater risk of severe injury and suffering.

69.    Parham has not received any treatment for his chronic HCV. He will not be considered for DAA treatment until at least January 2019 after completion of another FibroSure test.

70.    During this time, Parham's HCV may advance, further scarring his liver, inhibiting liver function, and putting him at even greater risk of cirrhosis, liver disease, excruciating pain, and death.

71.    No medical reason exists to deny Parham treatment with DAAs.

72.    Defendants' refusal to treat Parham with DAAs constitutes deliberate indifference to his serious medical need.

13

**Kim Caldwell**

73.     Kim Caldwell has been incarcerated in DPS custody since July 2015. He has a projected release date of April 24, 2021.

74.     He was diagnosed with HCV in 2015 while in DPS custody.

75.     Since then, he has not undergone any follow-up testing, although medical records from July 2016 indicate that HCV was still a concern at the time. Given this timeframe and that about 80% of acute HCV cases become chronic, it is highly likely that Caldwell has developed chronic HCV.

76.     Without appropriate testing, Caldwell has no way of knowing to what extent his disease has progressed.

77.     No medical reason exists to forgo HCV testing for Caldwell or to deny him treatment with DAAs if his infection has become chronic.

78.     Defendants' refusal to conduct follow-up testing and provide medically necessary treatment constitutes deliberate indifference to his serious medical need.

**DPS Screening and Treatment Policy**

79.     Policy #CP-7 in the DPS Health Services Policy and Procedure Manual governs the detection, evaluation, and treatment of HCV in North Carolina's prisons.

80.     This policy does not provide for universal screening of prisoners for HCV.

81.     Medical staff may order testing after consideration of certain risk factors, but there are no circumstances under which DPS policy requires that anyone be tested.

82.      DPS's total reliance on risk-based assessment falls short of the AASLD/IDSA guidelines, which recommend screening all persons who have ever been incarcerated.  As

14

a result, it is a virtual certainty that thousands of people in DPS custody have HCV, but have not been diagnosed.

83. After a patient is diagnosed with HCV, Step 2 of the policy directs medical staff to perform a physical examination, take a medical history, obtain baseline labs, evaluate for other potential causes of liver disease, begin patient counseling, and take certain preventative health measures.

84. Step 3 then directs medical staff to conduct a pretreatment evaluation, which includes reviewing lab tests, conducting a pregnancy test, and discussing treatment options with the patient.

85. In Step 4a, the policy requires a determination of whether treatment is contraindicated.

86. Most of the contraindications listed appear to be holdovers from the previously used regimen of interferon-based medicines, which DPS no longer uses. As such, they present medically unjustified barriers to treatment that now serve only to spare DPS the cost of treating more patients with DAAs.

87. Medical staff must cease all testing and treatment if a patient will not be incarcerated for long enough to complete treatment. Even though a course of treatment with DAAs typically requires no more than twelve weeks, the policy states that "[u]sually a twelve (12) month period would be required to complete assessment and treatment for Hepatitis C."

15

88.     As it stands now, the twelve month requirement has no medical justification. It exists only to spare DPS the cost of treating HCV-infected patients with less than a year left on their sentences.

89.     Testing and treatment must also stop if the patient "has infractions related to alcohol or drug use in the previous twelve months."

90.     This condition also lacks any medical justification, and may be another holdover from the previous interferon-based regimen. Today, this policy only serves to punish inmates for a disciplinary infraction by denying them necessary medical care, and to spare DPS the costs of DAA treatment for another subset of HCV-infected prisoners.

91.     Testing and treatment must also cease if the patient has a life expectancy of less than ten years. This window, however, provides ample time for an HCV-infected patient to develop cirrhosis, liver cancer, portal hypertension, and the painful resulting complications.

92.     DPS policy further lists unstable medical or mental health conditions as a contraindication.   Under the interferon-based treatment regime, it would have been appropriate to withhold treatment for patients with severe mental illness. With DAAs, however, as long as the patient is willing to receive treatment, these diagnoses are not contraindications.

93.     In Step 4b, the policy requires follow-up testing at certain intervals. Every six months, inmates with HCV must have alanine transaminase (ALT), aspartate aminotransferase (AST), bilirubin, albumin, and prothrombin time (INR) tests performed. Every year, a complete blood count (CBC) must be performed.

16

94.     As demonstrated by Plaintiff Caldwell, however, there is no guarantee that DPS will conduct *any* follow-up testing for patients diagnosed with HCV. Caldwell was initially diagnosed in 2015 but has not undergone any further HCV testing since that time.

95.     Step 5 sets out who may receive treatment. The policy permits DAA treatment only for patients at stage F2 and higher, with one exception: patients with a lower level of fibrosis but who are also infected with HIV or hepatitis B may also receive treatment. All others must be monitored as set out in Step 4b.

96.     There is no medical reason to prohibit DAA treatment for patients with a FibroSure score below F2. Indeed, Dr. Thomas Nuzum, a UNC physician who provides hepatology services for DPS, has admitted in other litigation that when treating non-incarcerated HCV patients, he does not require that they have a score of F2 or higher.

97.     Annual FibroSure testing is permitted by DPS policy, but not required. As a result, DPS has created a catch-22 in which HCV-infected prisoners may go indefinitely without a FibroSure test, but they cannot qualify for treatment unless they receive a sufficient FibroSure score.

98.     DPS policy expressly forbids the treatment of patients whose HCV is caught early, when they might be spared significant liver scarring, painful symptoms, and unnecessary risk of further injury and death. The only way for patients to qualify for HCV treatment is to wait while their disease advances, and hope that DPS decides to order a timely FibroSure test that provides an accurate result.

99.    Plaintiff Parham's lab records from February 2015 show that his disease had advanced to F2, but records from January 2018 show a score of F1-F2. DPS policy renders him ineligible for treatment, despite medical symptoms consistent with advanced fibrosis and cirrhosis including pedal edema, fluid retention, dermatitis, pruritis, and joint pain.

100.    Plaintiff Buffkin was diagnosed with HCV in August 2017 and his last lab records show a score of F1-F2. He suffers from chronic conditions associated with HCV, including fatigue and atopic dermatitis, but does not qualify for treatment under DPS guidelines.

101.    Similarly, Roger Elks is incarcerated at Greene Correctional Institution in Snow Hill, North Carolina. He was diagnosed with chronic HCV in March 2006 but does not qualify for treatment under DPS guidelines despite suffering from swelling in his legs, abdominal pain, and an enlarged liver.

102.    DPS policy may also deny DAA treatment to patients with even the most advanced cases of HCV. These patients are at the highest risk of developing liver cancer, portal hypertension, and the most painful HCV-related complications. They are denied potentially lifesaving treatment only because they fall under one of the policy's medically unjustified contraindications.

103.    For example, Jackie Housand is incarcerated at Greene Correctional Institution in Snow Hill, North Carolina. He was diagnosed with HCV in 2009 at Central Prison and remained in DPS custody until 2016. As he neared his release date, he learned he had

advanced HCV but that he would not be treated for the disease because he was within twelve months of his release date.

104. Housand was re-admitted to DPS custody in October 2017. He learned that he has advanced cirrhosis. He has not received any treatment for HCV.

## CLASS ACTION ALLEGATIONS

105. Plaintiffs seek to certify a class of all current and future prisoners in DPS custody who have or will have chronic HCV, at least 12 weeks remaining on their sentences, and have not been treated with DAAs (the "Plaintiff Class").

106. Defendants have the ability to identify all members of the Plaintiff Class.

107. The named Plaintiffs are members of the Plaintiff Class.

108. The requirements of Federal Rule of Civil Procedure 23(a) are satisfied:

    a. *Numerosity*. The Plaintiff Class is so numerous that joinder of all its members is impracticable. Defendant Smith has stated that in April 2018, DPS had identified 1,543 inmates with a diagnosis of chronic HCV. In December 2017, applying estimates from the NIH and CDC, Defendant Smith stated that the total number of prisoners in DPS custody with HCV could be between 6,559 and 12,553.

    b. *Commonality*. Questions of law and fact common to the Plaintiff Class include but are not limited to: (1) whether chronic HCV is a serious medical need; (2) whether Defendants' policy and practice of not treating chronic HCV with DAAs constitutes deliberate indifference to serious

medical needs; (3) whether Defendants' policies and practices concerning screening and monitoring HCV comply with the standard of medical care and constitute deliberate indifference to serious medical needs; (4) whether chronic HCV is a disability under the ADA; (5) whether prison medical services are a program or service under the ADA; (6) whether Defendants have discriminated against members of the Plaintiff Class on the basis of their disability.

c. *Typicality*. The claims of the named Plaintiffs are typical of the claims of the Plaintiff Class. The named Plaintiffs have been diagnosed with HCV, are subject to DPS's policy concerning HCV treatment and screening, have been denied HCV treatment, and are at the same kind of risks of substantial harm as members of the Plaintiff Class.

d. *Adequacy*. The class representatives and class counsel will fairly and adequately protect the interests of the Plaintiff Class. The class representatives are committed to obtaining declaratory and injunctive relief that will benefit themselves and the Plaintiff Class by ending Defendants' unlawful policy and practice of denying medically necessary care. They have a strong personal interest in the case and have no conflicts with class members. Named Plaintiffs are represented by experienced counsel who have specialized expertise in civil rights litigation on behalf of prisoners.

109. The requirements of Rule 23(b)(2) are satisfied. DPS has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding

declaratory relief is appropriate respecting the class as a whole. The injunctive relief sought will end the unlawful policy and practice for all class members, allowing them to receive proper screening and treatment for HCV.

## CAUSES OF ACTION

### Count I – Eighth Amendment to the U.S. Constitution, via 42 U.S.C. § 1983

110. Defendants know of and enforce the policies and practices described above. They know of Plaintiffs' and the Plaintiff Class's serious medical needs, but intentionally refuse to provide screening and treatment addressing those needs. Defendants know that failure to treat those serious medical needs has harmed Plaintiffs and the Plaintiff Class, and continues to place them at substantial risk of serious harm.

111. Defendants' conscious disregard of the risks facing Plaintiffs and the Plaintiff Class violates all standards of decency and constitutes deliberate indifference to serious medical needs.

### Count II – Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*

112. The Americans with Disabilities Act (ADA) prohibits public entities from discriminating against persons with disabilities in their programs, services, and activities. 42 U.S.C. §§ 12131–12134.

113. The ADA defines "public entity" as any state or local government or "any department, agency . . . or other instrumentality" of a state or local government. 42 U.S.C. § 12131(1)(A), (B).

114. Defendant DPS is a "public entity" under the ADA.

115. Plaintiffs and each member of the Plaintiff Class have a disability under the ADA.

21

116.    Plaintiffs and each member of the Plaintiff Class are "a qualified individual with a disability" under the ADA because they meet the essential eligibility requirements for the receipt of services or participation in programs or activities provided by DPS, except that they require reasonable modifications to rules, policies, or practices, the removal of barriers, or the provision of auxiliary aids and services.

117.    DPS discriminates against Plaintiffs and the Plaintiff Class in violation of the ADA by withholding medically necessary treatment that will likely cure their disability, while not withholding medically necessary treatment from individuals with different disabilities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court issue the following relief:

a.      A declaratory judgment that Defendants' policy of withholding DAA treatment from persons in DPS custody diagnosed with chronic HCV violates the Eighth Amendment and the ADA.

b.      A declaratory judgment that Defendants' failure to offer HCV screening to all persons in DPS custody violates the Eighth Amendment and the ADA.

c.      Preliminary and permanent injunctions ordering Defendants to: (i) formulate and implement an HCV treatment policy that meets the current standard of medical care, including identifying and monitoring persons with HCV; (ii) treat Plaintiffs members of the Plaintiff Class with appropriate DAAs; and (iii) provide Plaintiffs and members of the Plaintiff Class an appropriate and accurate assessment of their level of fibrosis or cirrhosis, counseling on drug interactions, and ongoing medical care for complications

and symptoms of HCV; and (iv) any further appropriate injunctions to prevent future violations of Plaintiffs' and the Plaintiff Class's rights.

d.      Award named Plaintiffs compensatory and punitive damages.

e.      Award Plaintiffs' costs, including reasonable attorneys' fees.

f.      Allow any further relief to which Plaintiffs and the Plaintiff Class may be entitled.

Respectfully submitted, this the 15th day of June, 2018.

/s/ Michele Luecking-Sunman
Michele Luecking-Sunman
N.C. Bar No. 31655
Daniel K. Siegel
N.C. Bar No. 46397
North Carolina Prisoner Legal Services, Inc.
P.O. Box 25397
Raleigh, NC 27611
(919) 856-2220
mlueckingsunman@ncpls.org
dsiegel@ncpls.org

/s/ Christopher A. Brook
Christopher A. Brook
N.C. Bar No. 33838
Emily E. Seawell
N.C. Bar No. 50207
ACLU of North Carolina
P.O. Box 28004
Raleigh, NC 27611
(919) 834-3466
cbrook@acluofnc.org
eseawell@acluofnc.org

*Attorneys for Plaintiffs*