**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| LLOYD BUFFKIN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:18CV502 |
| | ) | |
| ERIK HOOKS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on Plaintiffs Lloyd Buffkin, Kim Caldwell, and Robert Parham's (collectively "Plaintiffs") Motion to Certify Class (Docket Entry 3) and Motion for a Preliminary Injunction. (Docket Entry 26.) Defendants Erik Hooks, Abhay Agarwal, Kenneth Lassiter, Paula Smith, and the North Carolina Department of Public Safety (collectively "Defendants") have filed responses to both motions. (Docket Entries 31, 32.) Plaintiffs thereafter filed replies. (Docket Entries 34, 35.) By request of Plaintiffs, a hearing was held in this matter on October 29, 2018 regarding Plaintiffs' motion for a preliminary injunction. (Minute Entry dated 10/29/2018.) A week later, a second hearing was held on Plaintiffs' motion to certify the class. (Minute Entry dated 11/5/2018.) For the reasons stated herein, the undersigned recommends that both motions be granted.

## I.     BACKGROUND

According to the Complaint, Plaintiffs, currently incarcerated by the North Carolina Department of Public Safety ("DPS"), all have been diagnosed with Hepatitis C Virus

("HCV") infection, a highly communicable disease that scars the liver and presents risks of cancer, portal hypertension, excruciating pain, and death. (Compl. ¶ 1, Docket Entry 1.) According to the opinion of Dr. Andrew Muir,[1] common methods of HCV transmission include intravenous drug use and receipt of blood products or organs before universal testing of donors. (Muir Am. Aff. ¶ 8.) Initial exposure is generally asymptomatic for those infected with HCV; however, nearly 80% of patients exposed to HCV will develop chronic HCV. (*Id.* ¶ 9.) During the chronic infection phase, patients slowly develop scarring or fibrosis of the liver, and may eventually lead to significant liver scarring, called cirrhosis. (*Id.*) At that stage, patients are at risk of painful and life-threatening complications that often require invasive and painful treatments. (*Id.* ¶ 11.) Additionally, all patients with cirrhosis from HCV are at risk for the development of liver cancer or hepatocellular carcinoma ("HCC"). (*Id.* ¶ 12.) If a patient is not treated with direct-acting antiviral drugs ("DAAs") before cirrhosis occurs, the patient's fibrosis may be irreversible. (*Id.*)

Proper screening for HCV is required to diagnose patients prior to the development of the complications of cirrhosis and liver cancer. (*Id.* ¶ 13.) Failure to identify HCV at its early stages of disease places patients at risk for the development of the life-threatening complications of portal hypertension and liver cancer. (*Id.*) The initial test for HCV screening or diagnostic evaluation is a blood test for the HCV antibody. (*Id.* ¶ 14.) A blood test for HCV RNA confirms the presence of active HCV infection. (*Id.*)

---

[1] Plaintiffs rely upon the affidavit of Dr. Andrew Muir, a board-certified gastroenterologist and Chief of the Division of Gastroenterology at Duke University, to consult on Defendants' policies and practices regarding HCV, and to provide some background information regarding HCV. (*See generally*, Compl. ¶¶ 22-51; Muir Aff., Docket Entry 1-1; *see also* Muir Am. Aff., Docket Entry 27-1.)

The American Association for the Study of Liver Diseases ("AASLD") and Infectious Diseases Society of America ("IDSA") Guidance recommends screening for certain persons, including persons who were ever incarcerated. (*Id.* ¶ 15.) Incarcerated populations have higher rates of HCV than the general population. An estimated 16-41% of incarcerated persons in North America are positive for antibodies against HCV. (*Id.* ¶ 16.) This data supports the recommendation that all persons who were ever incarcerated be tested. (*Id.*) Data also suggests that treatment of incarcerated persons helps the incarcerated population but also has public health benefits by averting infections that would have occurred after the individuals are released from prison. (*Id.*) HCV screening would likely diagnose 42,000-91,000 new HCV cases in the next 30 years in prisons; if treatment is administered, prisons could prevent 4,200-11,700 liver-related deaths. (*Id.*)

Once a patient is exposed to HCV, approximately 15-20% of people will clear infection spontaneously. (*Id.* ¶ 18.) If the patient has HCV RNA detected more than 6 months after exposure, the patient has chronic HCV infection. (*Id.*) Chronic HCV requires an assessment of fibrosis, which develops slowly over the course of years. (*Id.* ¶¶ 19-20.) The most commonly used scoring system for fibrosis is a scale of 0 (no fibrosis) to 4 (cirrhosis). (*Id.* ¶ 20.) When a patient develops chronic HCV, the disease will almost certainly progress until the infection is cleared or the patient dies. (*Id.* ¶ 23.) In 2007, HCV mortality rates in the United States surpassed deaths from HIV infection.[2] (*Id.* ¶ 24.) A critical component of a

---

[2] According to the Centers for Disease Control and Prevention ("CDC"), the "annual hepatitis C-related mortality in 2013 surpassed the total combined number of deaths from 60 other infectious diseases reported to CDC, including HIV, pneumococcal disease, and tuberculosis." Centers for Disease Control and Prevention, *Hepatitis C Kills More Americans than Any Other Infectious Disease*,

strategy to reduce this risk of early mortality would be early treatment prior to the development of cirrhosis. (*Id.*)

A commonly available fibrosis assessment mechanism is FibroSure, which can report specific stages from 0 to 4. (*Id.* ¶ 27.) However, assessments of test characteristics reveal that they cannot do so with consistent accuracy. (*Id.*) The weakness in these tests has made it difficult to assess fibrosis progression over time with confidence in an individual patient. (*Id.*) The test performs better in their assessment of advance fibrosis or cirrhosis. (*Id.*) The test characteristics are modest with sensitivity for detecting significant fibrosis reported at 60-75% with specificity 80-90%. (*Id.*)

For more than two decades, HCV treatment involved regimes that included interferon-alpha. (*Id.* ¶ 29.) As a result of the numerous side effects including severe flu-like symptoms, anxiety, and depression, many patients discontinued treatment. (*Id.*) In 2013, DAAs become available and produced high efficacy rates. (*Id.* ¶ 30.) Interferon-based regimes were no longer recommended for HCV treatment by the AASLD/IDSA Guidance panel. (*Id.*)

In the instant action, Plaintiffs have sought specific medical treatment, DAAs, to treat their HCV infection. (Compl. ¶ 2.) Notwithstanding inmates infected with Hepatitis B or HIV, current DPS policy permits only individuals with significant fibrosis to receive DAA treatment. (*Id.* ¶¶ 3, 25, 95.) DPS uses a FibroSure test to determine a patient's level of fibrosis; a score of F2 demonstrates significant fibrosis, a score of F3 demonstrates severe fibrosis, and F4 is cirrhosis, which is the most severe fibrosis. (*Id.* ¶ 33.) Inmates with a score

_____

available at https://www.cdc.gov/media/releases/2016/p0504-hepc-mortality.html (last visited November 28, 2018).

of F2 or higher are permitted to receive DAA treatment.[3] (*Id.* ¶ 95.) As previously indicated, the adequacy of the FibroSure test is poor, and even those inmates with significant liver scarring may not receive DAA treatment if certain contraindications are present. (*Id.* ¶¶ 5, 34.) Plaintiffs argue that the restrictions in the DPS policy are not medically justified. (*Id.* ¶ 5.)

The named Plaintiffs in this action are Lloyd Buffkin, Robert Parham, and Kim Caldwell. (*Id.* ¶¶ 13-15.) At the time of the filing of the Complaint, all three prisoners had been diagnosed with HCV and had not been treated for it. (*Id.*) Buffkin has been incarcerated since July of 2013 and was diagnosed with HCV in August of 2017. (*Id.* ¶¶ 52-53.) In July of 2017, he registered a FibroSure score of F1-F2. (*Id.* ¶ 54.) Parham has been incarcerated since October 2008 and has lived with chronic HCV for more than 20 years. (*Id.* ¶¶ 62-63.) Lab records from January 2018 show a score of F1-F2. (*Id.* ¶ 65.) Caldwell has been incarcerated since July of 2015 and he was diagnosed with HCV in 2015 while in DPS custody. (*Id.* ¶¶ 73-74.) From 2015 up until the filing of the Complaint, Caldwell had not undergone any follow-up testing to determine the extent of his disease. (*Id.* ¶ 75.) After this action was filed, Caldwell began DAA treatment. (*See* Docket Entry 32 at 16 n.1.)

All of the above-named Plaintiffs challenge the DPS Screening and Treatment Policy ("Policy #CP-7") regarding the detection, evaluation, and treatment of HCV in North Carolina's prisons. (Compl. ¶ 79.) Currently Policy #CP-7 does not provide for universal screening of all prisoners for HCV. (*Id.* ¶ 80.) DPS relies upon a risk-based assessment in which prison medical officials may order testing after consideration of certain risk factors but

---

[3] Policy #CP-7 permits inmates with an FibroSure score below F2 to receive DAA medication if they also have HIV or Hepatitis B. (Compl. ¶ 95.)

there are no circumstances which require that anyone be tested. (*Id.* ¶ 81.) Plaintiffs argue that this risk-based assessment falls short of the guidance from the AASLD/IDSA which constitute the current standard of care for HCV screening. (*Id.* ¶¶ 36, 82.) Plaintiffs argue that because of DPS's risk-based assessment approach to HCV, there are essentially thousands of prisoners who have HCV and who have not been diagnosed. (*Id.*)

After initial screening, Policy #CP-7 sets forth additional directives for medical officials, including performing physical examinations, obtain medical history information, lab testing, and pretreatment evaluations. (*Id.* ¶¶ 83-84.) Policy #CP-7 then requires a determination of whether treatment is contraindicated. (*Id.* ¶ 85.) Some contraindications include: (1) whether an inmate will remain incarcerated long enough to complete treatment; (2) whether an inmate has infractions related to alcohol or drug use within twelve months of treatment; (3) whether an inmate's life expectancy is less than ten years; and (4) whether an inmate has unstable medical or mental health conditions. (*Id.* ¶¶ 87, 89, 91-92.) Plaintiffs assert that most of the contraindications are holdovers from the previous HCV treatment, are cost-saving measures for Defendants, and are unjustifiable. (*Id.* ¶¶ 86, 88, 90-92; *see also* Muir Am. Aff. ¶¶ 31-37.)

Once a prisoner has been diagnosed with HCV, Policy #CP-7 also requires follow-up testing every six months and a complete blood count must be performed annually. (Compl. ¶ 93.) As Caldwell had not undergone any follow-up testing from 2015 up to the filing of the Complaint, Plaintiffs argue that there is no guarantee that such testing will be done. (*Id.*)

As a result of DPS's current screening and treatment policies regarding HCV, Plaintiffs have alleged an Eighth Amendment claim pursuant to 42 U.S.C. § 1983 and a claim under the

6

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.* (Compl. ¶¶ 110-117.) In conjunction with the Complaint, the named Plaintiffs also filed a motion to certify class. (Docket Entry 3.) Plaintiffs seek to certify a class defined as "all current and future prisoners in DPS custody who have or will have chronic hepatitis C virus, at least twelve weeks remaining on their sentences, and have not [received DAAs]." (*Id.* at 1; Compl. ¶ 105.) Additionally, Plaintiffs ask the Court to issue a preliminary injunction ordering Defendants to: (1) provide universal opt-out HCV screening for all persons who are or will be in DPS custody; (2) cease denying DAA treatment for the contraindications listed in Policy #CP-7 (other than patient refusal); and (3) treat Plaintiffs and all members of their class with DAAs according to the current standard of medical care set out in the AASLD/IDSA Guidance, regardless of an individual's fibrosis level. (Docket Entry 26.) Defendants have opposed both motions. (Docket Entries 31, 32.)

## II. <u>DISCUSSION</u>

### A. <u>Plaintiffs' Motion to Certify Class</u>

The named Plaintiffs seek to certify a class defined as "all current and future prisoners in DPS custody who have or will have chronic hepatitis C virus, at least twelve weeks remaining on their sentences, and have not [received DAA treatment]." (*Id.* at 1; Compl. ¶ 105.) The named Plaintiffs move pursuant to Federal Rule of Civil Procedure 23 and Local Rule 23.1(b).[4] Federal Rule of Civil Procedure 23 sets forth a two-step analysis that governs

---

[4] Pursuant to Local Rule 23.1, in ruling upon whether a matter may be maintained as a class action, "the Court may allow the action to be so maintained, may disallow and strike the class action allegations, or may order postponement of the determination pending discovery or such other preliminary procedures as appear to be appropriate and necessary in the circumstances." M.D.N.C. LR 23.1(b). "The burden shall be upon any party seeking to maintain a case as a class action to present

the standard for class certification. Fed. R. Civ. P. 23. First, the prerequisites (commonly referred to as numerosity, commonality, typicality, and adequacy) require that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all members only if:"

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)-(4). The Fourth Circuit Court of Appeals has reiterated that

> the final three requirements of Rule 23(a) tend to merge, with commonality and typicality serving as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

*Brown v. Nucor Corp.*, 576 F.3d 149, 152 (4th Cir. 2009) (internal quotations and citations omitted).

In addition, the Fourth Circuit has "repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable'" or ascertainable such that the "court can readily identify the class members in reference to objective criteria." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (citation omitted).

---

an evidentiary basis to the Court showing that the action is properly maintainable as such." M.D.N.C. LR 23.1(d).

The moving party "need not be able to identify every class member at the time of certification." *Id.* However, "[i]f class members are impossible to identify without extensive and individualized fact-finding or mini-trials, then a class action is inappropriate." *Id.* (internal quotations and citations omitted).

Upon satisfying Rule 23(a), the moving party must demonstrate that the action falls under one of the three types of class listed in Rule 23(b). Here, Plaintiffs assert that Rule 23(b)(2) is applicable which states that a class action may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). Simply put, Rule 23(b)(2) applies "only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). Plaintiffs bear the burden of demonstrating that the class complies with Rule 23. *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 321 (4th Cir. 2006) (citation omitted). District courts have broad discretion in deciding whether to certify a class. *Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010).

1. Ascertainability of the Proposed Class

Defendants first argue that the class as defined is not ascertainable because it includes both current and future DPS inmates "without any time limit" and it requires knowledge of all prisoners who have HCV or will have HCV in the future. (Docket Entry 31 at 6-8.) Defendants' argument is unpersuasive. As previously stated, every class member need not be identified at the time of certification. The fact that the DPS prison population changes daily does not prevent the certification of the proposed class. Indeed, several courts have routinely

permitted prisoner class actions challenging healthcare policies. *See Scott v. Clarke*, 61 F. Supp. 3d 569, 583 (W.D. Va. 2014) (collecting cases). The key here is the "indivisible nature of the injunctive or declaratory remedy warranted" such that "each individual class member would [not] be entitled to a *different* injunction or declaratory judgement against the defendant." *Wal-Mart Stores,* 564 U.S. at 360 (emphasis in original). All prisoners, as defined in the proposed class, would have access to HCV screening and appropriate follow-up treatment.

Even more notable here is the Court's consideration of ascertainability within the context of a Rule 23(b)(2) class action. As previously stated, the Fourth Circuit acknowledges the "implicit threshold requirement of ascertainability." *See Adair*, 764 F.3d at 358. However, it has not addressed this issue directly in the context of a Rule 23(b)(2) class action. Several other circuits have addressed this issue and have applied the requirement of ascertainability less stringently in Rule 23(b)(2) cases. *See Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 2220 (2017) ("The advisory committee's notes for Rule 23(b)(2) assure us that ascertainability is inappropriate in the (b)(2) context."); *Shelton v. Bledsoe*, 775 F.3d 554, 562 (3d Cir. 2015) ("The ascertainability requirement ensures that the procedural safeguards necessary for litigation as a (b)(3) class are met, but it need not (and should not) perform the same function in (b)(2) litigation."); *Shook v. El Paso Cty.*, 386 F.3d 963, 972 (10th Cir. 2004) ("[M]any courts have found Rule 23(b)(2) well suited for cases where the composition of a class is not readily ascertainable; for instance, in a case where the plaintiffs attempt to bring suit on behalf of a shifting prison population."); *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972) (citation omitted) ("[T]he conduct complained of is the benchmark for determining whether a subdivision (b)(2) class exists, making it uniquely suited to civil rights

actions in which the members of the class are often 'incapable of specific enumeration'."). *But see Adashunas v. Negley*, 626 F.2d 600, 603-04 (7th Cir. 1980) (declining certification of a proposed class of "children entitled to a public education who have learning disabilities and 'who are not properly identified and/or who are not receiving' special education" because of definiteness concerns); *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (internal quotation omitted) ("A class made up of residents of [Texas] active in the peace movement does not constitute an adequately defined or clearly ascertainable class contemplated by Rule 23.").

At the hearing, Defendants took specific issue with a portion of the proposed class definition, specifically the portion of the class definition that states that prisoners have at least twelve weeks remaining on their sentences.[5] Defense counsel stated that removing this portion would provide more certainty to the issues here. Given all the considerations above, the Court concludes that the proposed class, modified to exclude the twelve week sentence window, is ascertainable.[6]

2. <u>Numerosity</u>

The numerosity requirement provides that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Defendants do not oppose this issue. DPS has identified 1,543 persons in custody who have been diagnosed with chronic HCV; Defendant Smith stated that the DPS prisoner population is approximately 37,000, and

---

[5] The hearings in this matter were recorded. The Court has not ordered a certified transcript at this time.
[6] Defendants made additional arguments related to ascertainability in the opposition brief. (*See* Docket Entry 31 at 7-8.) Again, given the representations made at the hearing, the Court finds it unnecessary to further address this issue.

the number of prisoners with HCV could be between 6,559 and 12,553. (*See* Ex. E, Docket Entry 3-5 at 3; Dr. Paula Smith Aff. ¶¶ 9-11, Docket Entry 3-4.) Given such estimates, joinder of all DPS prisoners would certainly be impracticable. *Scott*, 61 F. Supp. 3d at 584 (citation omitted) ("In general, if a proposed class size exceeds 25 plaintiffs, joinder is usually presumed impracticable."); *see also Dean v. Coughlin*, 107 F.R.D. 331, 332-33 (S.D.N.Y. 1985) ("The fluid composition of a prison population is particularly well-suited for class status, because, although the identity of the individuals involved may change, the nature of the wrong and the basic parameters of the group affected remain constant.")

3. <u>Commonality</u>

The commonality prerequisite provides that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A single common question is sufficient. *Wal-Mart Stores*, 564 U.S. at 359 (citation omitted). Here Plaintiffs allege the same injuries that the proposed class are suffering in that Defendants maintain a policy that fails to provide them with adequate medical treatment for chronic HCV which constitutes deliberate indifference to a serious medical need, and amounts to discrimination on the bases of their disability. Defendants do not dispute that this requirement is met. The undersigned also agrees. *See Postawko v. Missouri Dep't of Corr.*, No. 2:16-CV-04219-NKL, 2017 WL 3185155, at *7 (W.D. Mo. July 26, 2017) (unpublished) ("The Court is satisfied that the commonality requirement is met because the alleged HCV-treatment policies or customs are the 'glue' that holds together the putative class; either these policies are unlawful as to all inmates or they are not.").

4. Typicality

To satisfy the typicality requirement, "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Claims are typical of each other if they arise from the same event or pattern or practice and are based on the same legal theory." *Hoffer v. Jones*, 323 F.R.D. 694, 698 (N.D. Fla. 2017) ("*Hoffer I*") (internal quotations and citation omitted). Here, both Plaintiffs' claims and the class claims are rooted in deliberate indifference under the Eighth Amendment and discrimination under the ADA. (Compl. ¶¶ 110-17.) Defendants argue that Plaintiffs cannot establish that the decision to decline administering DAAs to the class members is based on the same course of conduct since the decision is based upon an individual risk-based assessment that considers an inmates medical history and potential contraindications. (Docket Entry 31 at 8; Dr. Anita Wilson Aff. ¶ 34, Docket Entry 32-1.) This Court disagrees and concludes that the typicality requirement is met.

The typicality requirement is not defeated simply because the class members may have some factual differences. Rather, courts that have rejected similar arguments seem to focus on the fact that all the class members suffer the same constitutional injury as they all are subjected to a prison policy that creates a substantial risk of harm. *See e.g.*, *Stafford v. Carter*, No. 117CV00289JMSMJD, 2018 WL 1140388, at *7 (S.D. Ind. Mar. 2, 2018) (unpublished) ("Plaintiffs raise claims regarding the policies maintained by [prison] regarding who receives and does not receive treatment for diagnosed HCV. These claims are not dependent on individualized assessments."); *Hoffer I*, 323 F.R.D. at 699 ("Plaintiffs' claims are based on the same legal theories as the class's claims, and Plaintiffs are not in a markedly different factual

position than other class members (at least not in a sense that would be relevant for purposes of their claims).”); *Postawko*, 2017 WL 3185155, at *8 (“[T]here may be variance in symptoms, contraindications for treatment, and differing levels of physical health from inmate to inmate, but every inmate suffers exactly the same constitutional injury when he is exposed to a single statewide [prison] policy or practice that creates a substantial risk of serious harm . . . .”). Plaintiffs’ success in the action would certainly benefit all DPS prisoners alike.

Defendants also argue that no specific set of criteria “governing-or precluding-particularized treatment to HCV-positive inmates” (*see* Docket Entry 31 at 8) is present, but Policy #CP-7 is the current governing policy that sets forth HCV treatment protocol. Plaintiffs’ allegations in the Complaint assert that this policy precludes HCV treatment in the form of DAAs based upon a set of specific criteria that embody restrictions that are not medically justified. (Compl. ¶¶ 3-5, 79-104.) Defendants’ argument is therefore unpersuasive.

### 5. Adequacy of Representation

The adequacy requirement provides that the class be certified only if “the representative parties will fairly and adequately protect the interests of the class.” Fed. R. Civ. P. 23(b)(4). This requirement “serves to uncover conflicts of interest between named parties and the class they seek to represent.” *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). There does not appear to be any dispute as to the adequacy of the class representatives. Also, the named Plaintiffs and the proposed class share the same common interests in this litigation. Thus, the Court concludes that this requirement is met.

6. Rule 23(b)(2)

Having satisfied the requirements of Rule 23(a), the Court must now decide whether this action falls within Rule 23(b)(2). As previously discussed, the key to Rule 23(b)(2) is the indivisible nature of the injunctive relief sought. *Wal-Mart Stores,* 564 U.S. at 360. "Rule 23(b)(2) has been liberally applied in the area of civil rights, including suits challenging conditions and practices at various detention facilities, as well as claims for violations of the ADA and Rehabilitation Act." *Bumgarner v. NCDOC*, 276 F.R.D. 452, 457 (E.D.N.C. 2011); *see also Scott*, 61 F. Supp. 3d at 591 (collecting cases). As explained by one court, "[t]he essential consideration is whether the complaint alleges that the plaintiffs have been injured by defendants' conduct which is based on policies and practices applicable to the entire class." *Santiago v. City of Philadelphia*, 72 F.R.D. 619, 626 (E.D. Pa. 1976).

Defendants argue that certification under Rule 23(b)(2) is inappropriate because DPS has not acted or refused to act towards the class in a general manner. (Docket Entry 31 at 9.) More specifically, Defendants assert that Policy #CP-7 is "not a one-size fits all approach." (*Id.*) Again, this argument is similar to Defendant's argument challenging typicality, and likewise unpersuasive. It is the policy itself that Plaintiffs are challenging and because Policy #CP-7 applies to all members of the class, the requested relief would benefit all members. *Chimenti v. Wetzel*, No. CV 15-3333, 2018 WL 2388665, at *9 (E.D. Pa. May 24, 2018) (unpublished) ("[T]he [prison's] Hepatitis C Protocol applies to all members of the class and the requested injunctive relief would provide relief to all class members."); *Graham v. Parker*, No. 16-CV-01954, 2017 WL 1737871, at *6 (M.D. Tenn. May 4, 2017) (unpublished) (rejecting "Defendants' argue[ment] that Rule 23(b)(2) does not apply in th[e] case because each

individual class member would be entitled to *different* declaratory or injunctive relief to redress individual injuries") (emphasis in original).  Thus, Defendants' argument fails.

### 7. Standing to Challenge HCV Screening

Lastly, Defendants argue that the named Plaintiffs lack standing to challenge DPS's HCV screening protocol and thus cannot represent the class on these issues.  (Docket Entry 31 at 9-11.)  To establish constitutional standing, "(1) the plaintiff is required to have sustained an injury in fact; which (2) must be causally connected to the complained-of conduct undertaken by the defendant; and (3) will likely be redressed if the plaintiff prevails." *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  In the case of class actions, "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976) (internal quotations and citation omitted); *accord Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011).  In other words, "[t]here must be a named plaintiff with constitutional standing to assert each claim." *Clark v. Duke Univ.*, No. 1:16-CV-1044, 2018 WL 1801946, at *2 (M.D.N.C. Apr. 13, 2018) (unpublished).

Here, Defendants contend that each of the named Plaintiffs have been diagnosed with HCV, therefore they no longer require screening.  (Docket Entry 31 at 10.)  Parham was diagnosed prior to his incarceration and both Caldwell and Buffkin were diagnosed while in prison.  (Compl. ¶¶ 53, 63, 74.)  Thus, it is Defendants' position that implementing universal opt-out HCV screening will provide no relief to the named Plaintiffs and would "not even affect them."  (Docket Entry 31 at 11.)  Defendants' argument, however, is flawed.  Policy

#CP-7 governs the management of HCV as a whole, in which all Plaintiffs are subject to as a result of their state of incarceration. Defendants argued at the hearing that the named Plaintiffs have divided out particular portions of Policy #CP-7 in their Complaint and motions, and thus, should not be able to argue that a broad application of Policy #CP-7 is warranted. Even if Caldwell and Buffkin were effectively screened and diagnosed as a result of the current Policy #CP-7, there is significant risk of reinfection by virtue of the prison environment and the discretion given to prison medical officials to conduct the initial screening. Indeed, even Defendants themselves admit that HCV is a public health concern and that the jail population has a higher concentration of HCV-infected persons than the general population. (Ans. ¶¶ 47-50, Docket Entry 25.) Thus, reinfection by the named Plaintiffs is a realistic danger, particularly with regard to prisoners such as Parham who is serving a life sentence. (Compl. ¶ 62.) *See also Peterson v. Nat'l Telecommunications & Info. Admin.*, 478 F.3d 626, 632 (4th Cir. 2007) (finding that in order to have standing, "[t]he plaintiff must demonstrate a realistic danger of sustaining a direct injury as a result of government action" (internal citations and quotations omitted)). As stated by another district court, "simply because an inmate does not use medical care, receives adequate care once, or does not or get attacked does not mean they are not at an unreasonable risk when policies and practices are deficient." *Hernandez v. Cty. of Monterey*, 305 F.R.D. 132, 149 (N.D. Cal. 2015); *see also Lippert v. Baldwin*, No. 10 C 4603, 2017 WL 1545672, at *2 (N.D. Ill. Apr. 28, 2017) (quoting *Helling v. McKinney,* 509 U.S. 25, 33 (1993) (rejecting Defendants' standing argument "because the Supreme Court has held that 'the Eighth Amendment protects against future harms to inmates' and a 'remedy for unsafe conditions need not await a tragic event.'")).

Moreover, as Plaintiffs contend, Defendants' argument creates a catch-22 quandary in that a prisoner would have to know of his or her HCV diagnosis to have standing to challenge Policy #CP-7, but that same knowledge would preclude a challenge to the HCV screening protocol.[7]  Defendants' position creates a situation where the screening provision within Policy #CP-7 could never be challenged.

In sum, the undersigned concludes that the named Plaintiffs have standing to challenge Policy #CP-7, including its HCV screening provision.  Given the HCV contagion in the prison context, the threat of future harm is imminent and a direct result of Policy #CP-7.  The relief the named Plaintiffs seek—universal opt-out screening—will provide them relief as well as the proposed class members.[8]  *See Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1305 (N.D. Fla. 2017) ("*Hoffer II*") (ordering a revised plan for HCV care to include "screening, evaluating . . ." even though plaintiffs had been already diagnosed at the time the civil action commenced); *Brooks v. Ward*, 97 F.R.D. 529, 533 (W.D.N.C. 1983) (permitting a class action where intervenor "and the class seek injunctive and declaratory relief for [a totality of] conditions of confinement [including screening policies] which affect all prisoners generally").

---

[7]  Another district court, outside of the prison context, found that a catch-22 scenario would create "an impossible burden" precluding "injunctive relief altogether."  *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 589 (N.D. Cal. 2015).

[8]  The undersigned further notes that it is unclear from Policy #CP-7 what exactly constitutes HCV screening.  The policy at Step 1 discusses appropriate screening for HCV.  (Policy #CP-7, Docket Entry 27-2 at 4.)  However, Step 2 provides for "initial medical follow-up anti-HCV positive inmates" which include baseline lab testing.  (*Id.* at 4-5.)  Thus, it is not entirely clear where DPS draws the line on its HCV screening process and moves into treatment.

8.  Appointment of Class Counsel

Rule 23(g) provides the considerations for appointment of class counsel in a class action.  Fed. R. Civ. P. 23(g).  Considerations include previous work regarding claims in the pending action, counsel's knowledge of the law and experience in class actions suits, and resources that counsel will commit to representing the class.  Fed. R. Civ. P. 23(g)(1). Defendants do not dispute the qualifications of Plaintiffs' counsel.  In addition, Plaintiffs assert that their attorneys have "specialized expertise in constitutional and civil rights litigation [and prisoner's rights] in federal court" and they have not identified any conflicts of interest in representing the proposed class.  (Docket Entry 4 at 16; Michele Luecking-Sunman Decl. ¶¶ 1-4, Docket Entry 3-6; Christopher A. Brook Decl. ¶¶ 1-5, Docket Entry 3-7.)  The Court thus concludes that Plaintiffs' counsel have satisfied Rule 23(g).[9]

B.  **Plaintiffs' Motion for Preliminary Injunction**

Plaintiffs also move for a preliminary injunction ordering Defendants to: (1) provide universal opt-out HCV screening for all persons who are or will be in DPS custody; (2) cease denying DAA treatment for the contraindications listed in Policy #CP-7 (other than patient refusal); and (3) treat Plaintiffs and all members of their class with DAAs according to the current standard of medical care set out in the AASLD/IDSA Guidance, regardless of an individual's fibrosis level.  (Docket Entry 26.)  A party seeking a preliminary injunction must establish all four of the following elements: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.  *Winter v. Natural Resources Defense*

---

[9] To the extent necessary, representations of Plaintiffs' counsel also satisfy Rule 23(a)(4).

*Council, Inc.*, 555 U.S. 7, 20 (2008); *see also The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346-47 (4th Cir. 2009), *overruling Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977).[10]   A party must make a clear showing that he is likely to succeed on the merits of his claim. *Winter*, 555 U.S. at 20; *Real Truth*, 575 F.3d at 345-46. Similarly, there must be a clear showing that the party is likely to be irreparably harmed absent injunctive relief. *Winter*, 555 U.S. at 20-22; *Real Truth*, 575 F.3d at 347.   Only then does the court consider whether the balance of equities tips in the favor of the party seeking the injunction. *See Real Truth*, 575 F.3d at 346-47.   Finally, the court must pay particular regard to the impact of the extraordinary relief of an injunction upon the public interest. *Real Truth*, 575 F.3d at 347 (quoting *Winter*, 555 U.S. at 23-24).   Injunctive relief, such as the issuance of a preliminary injunction, is an extraordinary remedy that may be awarded only upon a clear showing that the plaintiff is entitled to such relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *see also MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (a preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances" (citation and quotation omitted)).

"Mandatory preliminary injunctions are granted even more rarely than prohibitory preliminary injunctions." *Wheelihan v. Bingham*, 345 F. Supp. 2d 550, 553 (M.D.N.C. 2004). Moreover, in granting injunctive relief in the prison context, the relief "must be narrowly

---

[10] The original decision in *Real Truth* was vacated by the Supreme Court for further consideration in light of *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).   However, the Fourth Circuit reissued its opinion on Parts I and II of its earlier opinion in the case, 575 F.3d at 345-47, stating the facts and articulating the standard for issuance of a preliminary injunction, before remanding it to the district court for consideration in light of *Citizens United. See The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 607 F.3d 355 (4th Cir. 2010).

drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). Additionally, "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief . . . ." *Id.*

1. Standing for Challenges to HCV Screening and Contraindications

Prior to addressing the factors for injunctive relief, Defendants argue that Plaintiffs lack standing to challenge HCV screening in the prison, and lack standing to challenge the contraindications within Policy #CP-7 as neither of the named Plaintiffs have been denied DAA treatment as a result of the contraindications. (Docket Entry 32 at 5-7.) The Court has previously discussed, and found unpersuasive, Defendants' argument regarding lack of HCV screening. The contraindications have the same affect. Again, the challenge here is to systemic failures to provide adequate HCV care within prisons in the control of DPS. Policy #CP-7 applies to all prisoners, and as such, all prisoners, including the named Plaintiffs are subject to the policy in its entirety, including the contraindications. Defendants' argument thus fails.

2. Likelihood of Success on the Merits

**Deliberate Indifference**

In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court held that the Eighth Amendment to the Constitution "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Id.* at 832 (internal quotation and citation omitted). A successful Eighth

Amendment claim contains two elements: the deprivation must be, objectively, "sufficiently serious," and the prison official must have demonstrated a "deliberate indifference to inmate health or safety." *Id.* at 834.

"Deliberate indifference is a very high standard–a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999). Rather, the "deliberate indifference" prong requires Plaintiff to make "two showings:"

> First, the evidence must show that the official in question subjectively recognized a substantial risk of harm. It is not enough that the officers *should have* recognized it; they actually must have perceived the risk. Second, the evidence must show that the official in question subjectively recognized that his actions were inappropriate in light of that risk. As with the subjective awareness element, it is not enough that the official *should have* recognized that his action were inappropriate; the official actually *must have* recognized that his actions were insufficient.

*Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (internal citations and quotation marks omitted) (emphasis in original). "The subjective component therefore sets a particularly high bar to recovery." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). "'Deliberate indifference entails something more than mere negligence. . . .'" *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (quoting *Farmer* 511 U.S. at 835). "It requires that a prison official know of and disregard the objectively serious condition, medical need, or risk of harm." *Id.* To constitute deliberate indifference, "the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990).[11] Thus, a plaintiff may prove deliberate indifference by demonstrating that prisons officials have been "intentionally denying or delaying medical

---

[11] *Miltier* has been overruled by *Farmer* to the extent that it allowed a finding of deliberate indifference upon constructive knowledge, but it is still good law for the proposition cited.

access to medical care," *Estelle v. Gamble*, 429 U.S. 97 (1976), or by demonstrating that a substantial risk of harm was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it." *Scinto v. Stansberry*, 841 F.3d 219, 226 (4th Cir. 2016) (internal quotations and citation omitted). Also, "[a] delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732, 734 (4th Cir. 2015) (unpublished) (internal quotations and citation omitted).

However, it is clear that "mere negligence or malpractice" does not constitute deliberate indifference. *Miltier*, 896 F.2d at 852. Similarly, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985). It is well settled, therefore, that a medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment perpetuates severe pain. *Farmer*, 511 U.S. at 832-35.

Defendants do not dispute that chronic HCV is a serious medical need. Indeed, several courts have acknowledged that fact. *See Hoffer II*, 290 F. Supp. 3d at 1299 ("[I]t [should not] be surprising that [the] Court finds chronic HCV to be a serious medical need."); *Abu-Jamal v. Wetzel*, No. 3:16-CV-2000, 2017 WL 34700, at *14 (M.D. Pa. Jan. 3, 2017) (unpublished) (finding that "Plaintiffs has a reasonable likelihood of showing that chronic hepatitis C constitutes a serious medical need under the Eighth Amendment"); *Loeber v. Andem*, 487 F.

App'x 548, 549 (11th Cir. 2012) (unpublished) ("That Hepatitis C presents a serious medical need is undisputed."); *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004) ("HCV infection is unquestionably a serious medical problem."); *Campbell v. Young*, No. CIV. A. 700CV00046, 2001 WL 418725, at *3 (W.D. Va. Mar. 22, 2001) (unpublished) ("[T]here is no question that [plaintiff] suffers from a serious medical condition, namely, Hepatitis C and the associated pain and symptoms[.]").  If not treated, Plaintiffs are subject to substantial risks of harm, including significant liver scarring (cirrhosis) and exposed to high risks of cancer, extremely painful complications, and death.  (Muir Am. Aff. ¶¶ 11, 12, 38.)

The question thus becomes whether Defendants have acted with deliberate indifference by consciously disregarding the known risks of Plaintiffs' serious medical needs. The Court concludes that there is a substantial likelihood that Plaintiffs will be successful on this issue.[12]  Defendants are certainly aware of the prevalence of HCV in North Carolina's prisons.  In another HCV action, Defendant Smith concluded that approximately 12,553 DPS inmates are infected with HCV based upon review of the CDC's estimation that 33% of all incarcerated persons have HCV.  (Smith Aff. ¶ 11.)  By its current implementation, Policy #CP-7 in its entirety allows Defendants to act with deliberate indifference with regards to adequate detection and treatment of HCV to inmates in DPS's custody.  Defendants argue that the risk-based screening approach is an "evidence-based policy that incorporates concepts

---

[12] Having concluded that Plaintiffs have established a likelihood of success on the merits of their Eighth Amendment deliberate indifference claim, the Court need not address their claim under the ADA.  *See League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 248 (4th Cir. 2014) ("[B]ecause we find that Plaintiffs are likely to succeed on the merits under the Voting Rights Act, we need not, and therefore do not, reach the constitutional [claims].").

from the AASLD/IDSA Guidance, the Federal Guidelines ["BOP Guidance"], or both." (Docket Entry 32 at 12.) More particularly, Defendants state that "[b]ecause HCV may be asymptomatic, progresses slowly, and does so at rates that will vary from patient to patient, there is no evidence" suggesting that the proposed class is subject to excessive risk of harm. (*Id.*) This argument is flawed.

Appropriate and adequate screening is germane to the successful assessment and treatment of any significant health concern. *Cody v. Hillard*, 599 F. Supp. 1025, 1059 (D.S.D. 1984) ("In general, proper medical screening of inmates is a vital element of adequate medical services." (internal quotations and citation omitted)). That HCV may be asymptomatic is irrelevant here, particularly considering the numerical data regarding HCV in prisons. As previously noted, the estimations by Dr. Muir suggests that 16-41% of incarcerated persons in North America are positive for antibodies against HCV. (Muir Am. Aff. ¶ 16.) Thus, he asserts that screening for all persons who were ever incarcerated is appropriate as recommended by the AASLD/IDSA Guidance. (*Id.*) Indeed, the AASLD/IDSA Guidance acknowledges CDC's prior recommendation of general risk-based HCV testing[13] in 1998, but those guidelines expanded, partially due to "evidence demonstrating that a risk-based strategy alone failed to identify more than 50% of HCV infections[.]" (AASLD/IDSA Guidance, Docket Entry 27-5 at 4.) Considering that incarcerated populations have higher rates of HCV than the general population, Dr. Muir concluded that HCV screening in prisons (for all prisoners) would diagnose between 42,000 - 91,000 new HCV cases in the next 30 years; thus, "[b]y focusing on [the prison] population with high prevalence of HCV infection and curing

---

[13] This does not appear to be limited to the prison context.

them prior to release, there is less opportunity for them to spread HCV infection to others in the society." (Muir Aff. ¶ 16.) The key, however, is *effective* HCV screening, and the current risk-based screening approach implemented by DPS "is destined to fail." (*Id.* ¶ 17.)[14]

Defendants argue that the AASLD/IDSA Guidance does not create a standard of care for treatment for HCV. (Docket Entry 32 at 2; Wilson Aff. ¶ 16.) Defendants further contend that only 16% of prison facilities nationwide test all inmate for HCV upon entry, and similarly, only 17 states reported offering routine opt-out HCV testing in prison facilities. (Docket Entry 32 at 4; Ex. B to Wilson Aff., pp. 210-11, Docket Entry 32-3.) There can be no dispute that these numbers do not demonstrate that opt-out screening occurs in most of prisons across the states. Nevertheless, assuming *arguendo* that the AASLD/IDSA Guidance does not provide the standard of care HCV treatment, the Court must still ultimately determine whether DPS's HCV screening protocol provides prisoners with constitutionally adequate treatment. That the majority of prison facilities nationwide do not adhere to routine opt-out HCV testing does not mean that DPS's HCV screening protocol is constitutionally adequate. *See De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (emphasis in original) (holding, at the screening stage, that "just because [prison officials] have provided [prisoner] with *some* treatment consistent with the GID Standards of Care, it does not follow that they have necessarily provided her with *constitutionally adequate* treatment.").

The parties also dispute whether Defendants' prioritization of treatment and the use of contraindications constitutes deliberate indifference. The undersigned also concludes that

---

[14] As Plaintiffs point out, state law mandates HIV screening for all inmates. *See* N.C. Gen. Stat. § 148-19.2.

it is likely that Plaintiffs will succeed on the merits as to these points. In support of Defendants' position, Dr. Wilson points to the AASLD/IDSA Guidance that expressly recognizes the need to prioritize in certain contexts. (Wilson Aff. ¶ 27.) The Court is also mindful of the BOP Guidance which expresses the appropriateness of prioritization in certain circumstances within the medical context, including HCV treatment. (Ex. C to Wilson Aff., Docket Entry 32-5 at 12-13.) But as Plaintiffs argue, Policy #CP-7 does not create a priority list, but rather determines who will or will not receive treatment at all. An inmate that has a fibrosis level below F2 is ineligible for DAAs. Thus, they are not waiting for treatment. Instead, even with a HCV diagnosis, they must continue suffering until their condition worsens, nearly to the point of significant liver damage, before there is a possibility of treatment through DAAs. Dr. Muir noted that effective treatment of HCV involves treating patients well before the presence of cirrhosis.[15] (Muir Am. Aff. ¶ 38.)

Moreover, the Court cannot ignore the noted lack of consistent accuracy with the FibroSure testing mechanisms.[16] (*See* Muir Am. Aff. ¶ 27 (noting that the test characteristics are modest with sensitivity for detecting significant fibrosis reported at 60-75% with specificity 80-90%); *see also Chimenti*, 2018 WL 3388305, at *12 (finding that the prison system's "reliance on an inaccurate method of testing for fibrosis could result in the [prison system] failing to

---

[15] The court in *Stafford* held that "delaying treatment for chronic HCV until patients have developed more advanced stage liver fibrosis has been demonstrated to result in two to five times higher rates of liver-related mortality, as compared to those offered treatment at an earlier stage." 2018 WL 4361639, at *17 (citation omitted).

[16] Dr. Muir also acknowledges that in the last two years, several commercial payers and NC Medicaid stopped requiring a fibrosis score of F2 and are now treating all patients. (Muir Am. Aff. ¶ 39.) Also, Medicare and the Veterans Affairs medical centers do not restrict DAA therapy according to fibrosis. (*Id.*)

treat many individuals who suffer from advanced fibrosis and cirrhosis.")).  Here, Plaintiff Parham never registered a FibroSure score higher than F2, but his medical records indicate a history of cirrhosis, something commonly associated with a FibroSure score of F4.  (Muir Am. Aff. ¶¶ 40-41; Attach. 2 to Muir Am. Aff., Docket Entry 27-1 at 57-59.)  Although some individuals may be asymptomatic, those with a FibroSure test score below F2 may still experience very painful symptoms.  (Muir Am. Aff. ¶¶ 42-43.)

As to the four contraindications which Plaintiffs challenge, Defendants only argue that two particular contraindications—recent alcohol or drug infractions and unstable medical or mental health conditions—are similarly valued in the AASLD/IDSA Guidance and the BOP Guidelines.  (Docket Entry 32 at 14.)  Notwithstanding such, Dr. Muir indicates that they appear to be a holdover from the days of treatment with interferon-based regimens and they have no medical justifications.  (*See* Muir Am. Aff. ¶¶ 35, 37.)  This Court agrees.  Additionally, the requirement that an inmate have at least 12 months left on a sentence is not medically based (*see id.* ¶ 33), nor is it consistent with DAA treatment that typically requires only 8-12 weeks.  Treatment is also contraindicated if an inmate's life expectancy is estimated to be less than 10 years due to co-morbid conditions.  However, within that period of time, as Dr. Muir notes, "a patient could progress from compensated liver disease to decompensated cirrhosis and die from the awful complication of portal hypertension or liver cancer."  (*Id.* ¶ 34.)

Overall, the detection, evaluation and treatment of HCV in DPS's prisons must not violate the Eighth Amendment.  Here, whether its inadequate care, or a refusal to provide essential care to inmates, the undersigned finds that it likely that Plaintiffs will prevail on the merits of their claim by demonstrating that Policy #CP-7 exceeds the bounds of their Eighth

Amendment right to be free from cruel and unusual punishment.  *Torraco v. Maloney*, 923 F.2d 231, 234 (1st Cir. 1991) ("[D]eliberate indifference may be found where the attention received is so clearly inadequate as to amount to a refusal to provide essential care." (internal quotations and citation omitted)); *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990) ("Grossly incompetent or inadequate care can constitute deliberate indifference." (citation omitted)).

3. <u>The Extent to Which the Moving Party Will Suffer Irreparable Harm Without Injunctive Relief.</u>

The Court must also consider the extent in which the moving party will suffer irreparable harm if injunctive relief is not granted.  "[S]imply showing some possibility of irreparable injury fails to satisfy [this] factor."  *Nken v. Holder*, 556 U.S. 418, 435 (2009) (internal quotations and citation omitted).  Here, Parham and Buffkin will continue to suffer from chronic HCV if they do not receive treatment.  As stated in *Abu-Jamal*, "the efficacy of the DAA medications will likely be reduced if treatment is delayed."  2017 WL 34700, at *20. Both Parham and Buffkin have already suffered significant scarring and painful symptoms, including pedal edema and dermatitis.  (Muir Am. Aff. ¶¶ 41-43, 49.)  Thus, they will likely suffer irreparable harm absent injunctive relief.  *See Hoffer II*, 290 F. Supp. 3d at 1304 ("Although DAAs can cure . . . HCV, they do not necessarily reduce the level of fibrosis a person has already suffered.  Consequently, it is important to treat patients with HCV as soon as possible so that they can be cured of the virus before their liver becomes significantly diseased." (internal citations omitted)); *see also Abu-Jamal*, 2017 WL 34700, at *20 ("The realities of civil litigation make it likely that waiting for resolution at trial will prolong Plaintiff[s'] suffering for a significant period of time and result in an overall deterioration of his health.").

4. <u>The Extent to Which the Non-Moving Party Will Suffer Irreparable Harm if the Injunction is Issued.</u>

In determining whether to grant or deny injunctive relief, the Court must also consider the extent in which the non-moving party will suffer irreparable harm if the injunction is issued. In conclusory fashion, Defendants assert that the balance of harm does not tilt in Plaintiffs' favor because the relief they request would require "an extensive overhaul of [DPS's] health services operations, including review of logistical considerations of travel and housing assignments for personnel and patients, physical facility capabilities, and human resource capacities." (Docket Entry 32 at 17; *see also* Wilson Aff. ¶ 8.) The Court disagrees. Although the relief requested will require immediate change, the extent of such overhaul is limited to Policy #CP-7, which is solely related to the management of HCV. Any administrative or financial burdens that Defendants may face are outweighed by the constitutional guarantees under the Eight Amendment regarding adequate health care to inmates. *See Hoffer II*, 290 F. Supp. 3d at 1304 ("The threat of harm to the plaintiffs cannot be outweighed by the risk of financial burden or administrative inconvenience to the defendants." (internal quotations and citation omitted)); *Abu-Jamal*, 2017 WL 34700, at *20 ("While the Court is sensitive to the realities of budgetary constraints and the difficult decisions prison officials must make, the economics of providing this medication cannot outweigh the Eighth Amendment's constitutional guarantee of adequate medical care."); *Roe v. Elyea*, 631 F.3d 843, 863 (7th Cir. 2011) ("Although administrative convenience and cost may be, in appropriate circumstances, *permissible factors* for correctional systems to consider in making treatment decisions, the Constitution is violated when they are considered *to the exclusion of reasonable medical judgment* about inmate health."); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir.

1985) ("Lack of funds for facilities cannot justify an unconstitutional lack of competent medical care and treatment for inmates."). Accordingly, the balance of harm tips in Plaintiffs' favor.

5. <u>Whether an Injunction is in the Public Interest.</u>

"[I]f a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). That the injunctive relief requested may require some overhaul of DPS's health services (*see* Docket Entry 32 at 17) is no justification to deny relief. Defendants correctly note the latitude given by the courts for prison administration, and the Supreme Court has repeatedly stressed the need to provide wide-ranging deference to prison administrators in matters of prison management. *See Beard v. Banks*, 548 U.S. 521, 528 (2006); *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."). However, "the public is undoubtedly interested in seeing that inmates' constitutional rights are not violated." *Hoffer II*, 290 F. Supp. 3d at 1304. Moreover, as previously stated, Dr. Muir has noted the societal effects of treating HCV inside the prison. (Muir Am. Aff. ¶ 16.) Essentially, effective treatment in the prisons provide less opportunity for HCV transmission in society.[17] (*Id.*) This factor thus, weighs in Plaintiffs' favor.

---

[17] According to the Bureau of Justice Statistics, "[a]t least 95% of all state prisoners will be released from prison at some point." *Reentry Trends In The U.S.*, Bureau of Justice Statistics, https://www.bjs.gov/content/reentry/reentry.cfm (last visited November 27, 2018).

In concluding here that the injunctive relief requested should be granted, the Court is mindful of the rare circumstances in which mandatory preliminary injunctions are granted. The current management of HCV within the DPS prompts the necessity for court intervention to prevent significant harm while this civil action proceeds. Additionally, the Court finds that the relief requested is narrowly tailored as it focuses solely on revising one health care policy, Policy #CP-7. In *Brown v. Plata*, the Supreme Court held:

> To incarcerate, society takes from prisoners the means to provide for their own needs. Prisoners are dependent on the State for food, clothing, and necessary medical care. A prison's failure to provide sustenance for inmates may actually produce physical torture or a lingering death. Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society.

563 U.S. 493, 510-11 (2011) (internal quotations and citations omitted). Here, the undersigned finds that an injunction is necessary to ensure that Plaintiffs and all class members receive adequate medical care in a manner consistent with the tenets recognized in *Brown* and the Constitution.

## III.   <u>CONCLUSION</u>

For the reasons stated herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion to Certify Class (Docket Entry 3) be **GRANTED** and the class be defined as "all current and future prisoners in DPS custody who have or will have chronic hepatitis C virus and have not been treated with direct-acting antiviral drugs."

**IT IS FURTHER RECOMMENDED** that Lloyd Buffkin and Robert Parham be named as class representatives and that Plaintiffs' counsel be appointed as class counsel.

**IT IS FURTHER RECOMMENDED** that Plaintiffs' Motion for Preliminary Injunction (Docket Entry 26) be **GRANTED** and a preliminary injunction be issued ordering Defendants to: (1) provide universal opt-out HCV screening to all persons who are or will be in DPS custody; (2) cease denying DAA treatment for the contraindications, other than patient refusal, set out in Step 4a of DPS Policy #CP-7; and (3) treat Plaintiffs and all members of their class with DAAs according to the current standard of medical care set out in the AASLD/IDSA Guidance, regardless of an individual's fibrosis level.

_____
Joe L. Webster
United States Magistrate Judge

November 30, 2018
Durham, North Carolina